# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
### No. 19-1043V
Filed: July 22, 2024

```
* * * * * * * * * * * * * * * * * * * * * *  *
                                            *
                                            *
KAREN HOISINGTON,                           *
                                            *
                Petitioner,                 *
                                            *
v.                                          *
                                            *
SECRETARY OF HEALTH AND                     *
HUMAN SERVICES,                             *
                                            *
                Respondent.                 *
                                            *
* * * * * * * * * * * * * * * * * * * * * *  *
```

*Richard Gage*, Richard Gage, P.C., Cheyenne, WY, for Petitioner
*Colleen Clemons Hartley*, U.S. Department of Justice, Washington, DC, for Respondent

## RULING AWARDING DAMAGES[1]

**Oler**, Special Master:

On July 18, 2019, Karen Hoisington ("Petitioner") filed a petition, seeking compensation under the National Vaccine Injury Compensation Program ("the Vaccine Program").[2] Pet., ECF No. 1. Petitioner alleges she suffered from a Table injury of Guillain-Barré syndrome ("GBS") as a result of the influenza ("flu") vaccination she received on October 25, 2017. *See* Pet. at 1, ECF No. 1. After Respondent conceded that this case was appropriate for compensation, the Chief Special Master issued a ruling finding that Petitioner is entitled to compensation. ECF No. 17. The

---

[1] Because this Ruling contains a reasoned explanation for the action in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Ruling will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] The Vaccine Program comprises Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755 (codified as amended at 42 U.S.C. §§ 300aa-10–34 (2012)) (hereinafter "Vaccine Act" or "the Act"). All subsequent references to sections of the Vaccine Act shall be to the pertinent subparagraph of 42 U.S.C. § 300aa.

parties have been unable to resolve damages. For the reasons discussed below, I hereby award Petitioner a total of $200,000 for past pain and suffering, and $5,000 per year for future pain and suffering, as well as several life care plan items, discussed in detail, below.

## I.    Medical History

Petitioner's pre-vaccination medical history is remarkable for lumbar radiculopathy, gastroesophageal reflux disease ("GERD"), gallbladder polyps, fatty liver, and obesity. Ex. 4 at 99. She received the flu vaccine on October 25, 2017, at the age of 65. Ex. 1 at 61.

On November 10, 2017, Petitioner saw her primary care provider ("PCP") reporting arm and leg pain that began one week earlier. Ex. 1 at 55. She described weakness and cramping in her legs and a headache for the past four days. *Id.* Examination revealed normal reflexes, strength, sensation, and gait, and mild tenderness to palpation in the Petitioner's lower legs. *Id.* Petitioner received a diagnosis of bilateral leg pain and was prescribed gabapentin and tramadol. *Id.* at 58-59.

Petitioner was admitted to Swedish Hospital from November 12 to 20, 2017, complaining of pain in her right shoulder, weakness in both arms, numbness and tingling in both hands and the soles of her feet, and a headache. Ex. 4 at 78, 86. Examination revealed limited abduction of Petitioner's right shoulder, slightly decreased sensation to touch in the lateral aspects of her lower legs, diffuse decreased sensation to light touch in her right arm, and right arm weakness. *Id.* Petitioner underwent a cervical spine MRI, which showed severe bilateral neural foraminal stenosis at C5-C6. *Id.* at 89. The emergency room physician suspected GBS. *Id.* at 87.

On November 12, 2017, Petitioner saw neurologist Meagan Murgel, MD, who noted that Petitioner's face was symmetric with diminished sensation to light touch on the right side and diminished sensation to light touch in her hands, ulnar side of the forearms, and plantar feet. Ex. 4 at 105. Petitioner had normal strength but absent patellar and Achilles reflexes, while her other reflexes were 1+. *Id.* at 106.

Petitioner saw Dr. Murgel again on November 14. Ex. 4 at 175-79. Petitioner was unable to bear any weight on her legs. *Id.* at 177. Petitioner underwent electromyography ("EMG") and the results were consistent with acute inflammatory demyelinating polyneuropathy ("AIDP"). *Id.* at 173. Petitioner began treatment with IVIG. *Id.* She developed hyponatremia,[3] urinary retention, and constipation over the following days. *Id.* at 169.

At the time of her discharge to a skilled nursing facility on November 20, Petitioner had normal strength in her lower extremities and slightly diminished strength in her shoulders and right arm. Ex. 4 at 146. The areflexia in her lower extremities persisted. *Id.* Her primary diagnosis was GBS, specifically the Miller Fisher variant. *Id.* at 78.

---

[3] Hyponatremia is "deficiency of sodium in the blood." DORLAND'S MEDICAL DICTIONARY ONLINE, https://www.dorlandsonline.com/dorland/definition?id=24305 (last visited Nov. 28, 2023) ("DORLAND'S").

On November 21, 2017, Petitioner had a physical therapy ("PT") evaluation. Ex. 5 at 55-56. Petitioner's balance was fair as to static and dynamic sitting, but poor as to static and dynamic standing. *Id.* at 55. Petitioner denied pain. *Id.* She required maximum assistance with bed mobility and transfers and her gait was assessed as "total dependence [without] attempts to initiate." *Id.* at 56. At a follow-up the next day, Petitioner described her pain at rest as severe and constant. *Id.* at 68. Petitioner fatigued quickly after standing for six minutes and required medication for joint pain. *Id.*

Petitioner was admitted to Swedish Hospital a second time on November 23, 2017, for a possible urinary tract infection and one day of progressive weakness. Ex. 4 at 18-19. She was discharged on November 25. *Id.* at 18. At a follow-up visit on November 27, Petitioner reported feeling stronger on her left side and that her pain in her knees, hips, and shoulders was controlled with medication. Ex. 1 at 105. On December 1, 2017, Petitioner reported that her arms and legs were getting stronger. *Id.* at 117. On December 7, 2017, she reported increased sensation and strength in her arms and legs, but her incontinence persisted. *Id.* at 122.

At a neurology visit on December 11, 2017, Petitioner was making progress in rehab but noted ongoing diplopia[4] and anisocoria.[5] Ex. 1 at 129. Petitioner reported a band-like numbness across her midriff. *Id.* On examination, Petitioner was unable to lift her right leg, her left lower extremity lifted with drift, and she had no reflexes. *Id.* at 130. Her sensation to light touch was intact and her gait could not be assessed because she was bedbound. *Id.* The neurologist noted that Petitioner's symptoms suggested GBS and recommended that EMG be repeated two months after onset. *Id.* at 132.

At a follow-up appointment on December 15, 2017, Petitioner reported progress with bed mobility and transfers, as well as self-care in the bathroom. Ex. 1 at 141. Her progress toward returning home was deemed slow. *Id.* at 141-42. Petitioner returned for a follow-up on December 27, at which time she was improving slowly and continued to use a urinary catheter. *Id.* at 158. She was able to stand using a walker and her neuropathic pain was generally under control. *Id.* at 155. Petitioner requested an increase in her dosage of Neurontin. *Id.*

On January 17, 2018, Petitioner was medically cleared for discharge from the skilled nursing facility. Ex. 1 at 178. On January 25, 2018, a nurse practitioner followed up with a home visit, noting that a complete ten-point review of systems was negative except for ongoing bilateral hand and foot pain which was "well-controlled." *Id.* at 194-95. The NP also noted that Petitioner "requires minimal assistance" with bathing, laundry, light housekeeping, managing medications, meal prep, and shopping. *Id.* at 196.

On January 30, 2018, Petitioner fell at home and was readmitted to rehab with a fractured ankle. Ex. 1 at 201-03. She was discharged home on February 19, 2018. *Id.*

---

[4]   Diplopia is "the perception of two images of a single object." DORLAND'S, https://www.dorlandsonline.com /dorland/definition?id=14354 (last visited Nov. 28, 2023).

[5]   Anisocoria is "inequality in diameter of the pupils." DORLAND'S, https://www.dorlandsonline.com/dorland/ definition?id=2948 (last visited Nov. 28, 2023).

On April 12, 2018, Petitioner underwent EMG. Ex. 1 at 342-43. The results were abnormal, showing a non-length-dependent sensorimotor polyneuropathy with predominantly axonal features, consistent with GBS and incomplete recovery. *Id.* At a follow-up appointment on April 17, neurologist Bryan Pham, MD, noted that the recent EMG results were consistent with AIDP rather than chronic inflammatory demyelinating polyneuropathy ("CIDP"). *Id.* at 373. Examination during this appointment revealed normal muscle bulk with reduced tone, antigravity strength in her lower extremities with drift, slightly reduced strength in her right upper extremity with limited range of motion, slightly reduced strength in her left upper extremity, areflexia, intact sensation to light touch, improved finger to nose movement with limitation on the right, and gait was deferred. *Id.* at 371.

On May 19, 2018, Petitioner had an occupational therapy appointment. Ex. 1 at 410. At this appointment, she reported that she was able to dress herself independently and was able to use her right hand for eating. *Id.* She had progressed from using a wheelchair in her home to using a walker. *Id.* Petitioner stated that her functional use of her right hand had improved, but that she experienced constant tingling bilaterally in her fingertips, more so on the right side than the left. *Id.*

On July 11, 2018, Petitioner reported that she no longer used her wheelchair and that she was pleased with her progress in occupational therapy. Ex. 1 at 503. She complained of stiffness and swelling in her right hand. *Id.* At a telehealth appointment with her neurologist on July 12, 2018, Petitioner reported that her mobility was improving, but that she was not ready to begin using a cane. *Id.* at 513. Her diplopia had resolved, and she was deemed to be "recovering well." *Id.* at 515.

## II.   Procedural History

Petitioner filed her petition for compensation on July 18, 2019. Pet. She filed medical records and a statement of completion on July 31, 2019. ECF Nos. 7-8. On August 26, 2020, Respondent filed his Rule 4(c) Report conceding that this case is appropriate for compensation under the Vaccine Act. ECF No. 16 at 1. The chief special master issued a ruling finding that Petitioner is entitled to compensation on August 27, 2020. ECF No. 17.

The parties negotiated damages for some time, ultimately agreeing to loss of earnings and out-of-pocket expenses. ECF No. 76 at 1. Petitioner retained the expert life care planner services of Elizabeth Kattman and filed a life care plan on September 13, 2021. ECF No. 34. Respondent retained the expert life care planner services of Linda Curtis and filed a life care plan on November 15, 2021. ECF No. 42. Petitioner retained Dr. Mark McNulty as her expert economist and filed an economic loss report on January 13, 2022. ECF No. 45. Petitioner submitted Ms. Kattman's updated life care plan on July 13, 2022. ECF No. 59.

Petitioner filed additional medical records on March 18, 2022, and April 12, 2022. ECF Nos. 49, 52. I held a damages hearing on October 10, 2023. Petitioner filed additional medical records on October 20, 2023 (Exs. 16-18), November 20, 2023 (Exs. 19-20), December 21, 2023 (Ex. 21), and March 12, 2024 (Ex. 22). The parties filed post-hearing briefs concerning the disputed life care items and pain and suffering on June 4, 2024 and June 5, 2024. ECF Nos. 96, 97.

This matter is now ripe for a determination on damages.

## III.   Testimony at Damages Hearing

### A.  Petitioner

At the damages hearing, Petitioner described her life prior to her GBS. Tr. at 5. She was 65 years old and generally in good health at the time of vaccination. *Id.* She led a "fulfilling" life with her husband, having retired from a career in administration of public education in 2010. *Id.* at 5-6. She was active in multiple non-profits and enjoyed hiking, sewing, and spending time with her daughter, son-in-law, and granddaughter. *Id.* at 6-7. She stated that she and her husband supplemented their retirement savings "in a gambling endeavor." *Id.* at 7.

Petitioner stated that prior to her injury, she enjoyed gardening, including growing vegetables and roses. Tr. at 8. She was responsible for the care and cleaning of her house, as well as grocery shopping and meal preparation. *Id.*

Petitioner described joint pain in her knees, hips, elbows, and shoulders that kept her awake at night. Tr. at 9. She saw her PCP on November 10, 2017, complaining of severe cramping in her legs and shoulders that was not improved with heat, stretching, or analgesic cream. *Id.* Her symptoms worsened, and the next day she was unable to grip a coffee cup without dropping it. *Id.* at 10. Her muscle cramps continued and she experienced fatigue from the loss of sleep. *Id.* She went to urgent care where she was assured that she was not having a stroke but did not receive a diagnosis or treatment. *Id.* at 10-11.

After a few more days of worsening symptoms, Petitioner reported to the emergency room having lost feeling in her hands and feet. Tr. at 11. She was admitted and reported feeling "horrible." *Id.* During her hospital stay, she was unable to feed herself or use the restroom without assistance. *Id.* at 12. She described painful sensations to non-painful stimuli, such as touching a piece of fabric. *Id.* Her feet ached and felt cold even though the room was warm, and she continued to lose function in her limbs to the point where she was unable to sit up in bed or in a wheelchair. *Id.* at 13. She was taken for an MRI and EMG in the early hours of the first morning of her hospital stay. *Id.*

The results of Petitioner's EMG were consistent with GBS and she was referred to neurology. Tr. at 14. A foley catheter was inserted because Petitioner had lost bowel and bladder control. *Id.* She described her pain as constant throughout her hospitalization, in spite of receiving medication. *Id.* at 14-15. In particular, it was very painful if anyone touched her hands or feet. *Id.*

Petitioner was discharged to a skilled nursing facility, where she received a PT evaluation. Tr. at 16-17. She was unable to stand from her wheelchair and needed assistance in order to walk. *Id.* at 17. Petitioner also received an occupational therapy consultation during which she stood in a supportive device for six minutes, after which she felt "exhausted." *Id.* at 17-18.

Petitioner testified that sitting up for a meal increased her pain and nausea and that she was only able to use her left hand to eat. Tr. at 19. She was transferred back to the hospital for a possible urinary tract infection as a result of the catheter. *Id.* at 20. After seven days, she was transferred to a different skilled nursing facility, at which time she was still unable to sit up or move from her bed. *Id.* at 21. The pain in her hands and feet persisted to the point that she could not stand to be touched. *Id.* She described her right hand as "useless." *Id.* at 22.

Petitioner began occupational therapy and PT five times per week. Tr. at 22. She was committed to getting back to her normal life. *Id.* She continued to have pain in spite of increasing doses of tramadol and gabapentin. *Id.* at 23. Petitioner's urinary incontinence also persisted, and she remained catheterized during this time. *Id.* at 24.

Petitioner testified that, during her second admission to a skilled nursing facility, she suffered from diplopia, or double vision. Tr. at 24-25. She explained that this impairment was in addition to pre-existing astigmatism and binocularity, rendering her completely unable to read. *Id.* at 25. She testified that her diplopia began at the same time as her GBS. *Id.* Petitioner also suffered from anisocoria or unequal pupil size during this time, which also began with her GBS. *Id.* Petitioner stated that her eyes were more sensitive to light. *Id.* at 26.

Petitioner testified that she experienced a feeling of numbness in a band-like pattern around her midsection. Tr. at 26. She remembered feeling afraid that her GBS symptoms were moving up her body to her diaphragm and that she would be unable to breathe. *Id.* She stated that at the time of her testimony, this was still an issue and that she used particular caution when eating and drinking to avoid choking because she worried that lack of strength in her diaphragm might prevent her from dislodging anything from her throat. *Id.* at 26-27.

Petitioner explained that she was bed-bound through her second stay in a skilled nursing facility. Tr. at 27. She was unable to sit upright to eat without assistance and could not move herself from her bed to her wheelchair. *Id.* She described her progress during this time as "painfully slow." *Id.*

Petitioner testified that her discharge home in January 2018 involved a number of "adjustments." Tr. at 30. She was now able to sit up and get out of bed on her own, but she still lacked functional use of her hands. *Id.* She described needing up to 12 hours of sleep per day due to fatigue. *Id.* The pain in her hands was still severe enough that bath towels felt like sandpaper, and she could not bear to touch certain everyday items such as aluminum foil. *Id.* at 31. Petitioner was unable to cook, do daily chores, or tidy her home. *Id.* at 31-32. She received outpatient PT and OT at her home. *Id.* at 32. Her diplopia resolved spontaneously on January 27, 2018. *Id.* at 33.

Petitioner testified that she continued to have "lots of limitations." Tr. at 33. She fractured her ankle in January 2018 after falling in her bathroom due to weakness and numbness in her feet. *Id.* at 33-34. She experienced severe pain and even greater difficulty moving around her house. *Id.* at 35-36. Her ankle injury ultimately required surgery and the insertion of a plate and ten screws. *Id.* at 36. She was discharged back to a skilled nursing facility, which she described as emotionally distressing. *Id.* at 36-37. She referred to the lack of control over body as "traumatic" and herself as "emotionally fragile." *Id.* at 37.

6

After her discharge home, Petitioner testified that she "need[ed] assistance with everything." Tr. at 38. She was unable to bear any weight on her injured ankle and had to keep it elevated as much as possible. *Id.* at 38-39. Her husband removed the door from their bathroom to allow Petitioner's wheelchair to go in and out. *Id.* at 39. She was unable to prepare meals, bathe herself, or "take care of any aspect of running [her] household." *Id.* Petitioner required someone else in the house with her at all times. *Id.*

Petitioner testified that her PT and OT continued through November of 2019. Tr. at 40. She gradually gained the ability to use a rolling walker, but functional use of her right hand was still diminished. *Id.* She added that at the time of her testimony, her left hand was still stronger than her right. *Id.* at 40-41.

Petitioner stated that since mid-2018, her pain management regimen has included 2700 milligrams of gabapentin daily, as well as 1650 to 3000 milligrams of Tylenol. Tr. at 41.

Petitioner testified that she has difficulty bathing because she is unable to get in and out of the bathtub and the water pressure of a shower is irritating or painful. Tr. at 42. She lacks hand strength to wring out a washcloth. *Id.* She described "slicing" sensations in her fingertips while shampooing her hair. *Id.* She purchased a smooth shower mat because stepping on a wrinkled or bumpy one causes "tremendous pain…like walking on pebbles." *Id.* She testified that she constantly wears something on her feet because walking barefoot is painful. *Id.* Petitioner testified that basic self-care activities such as trimming her toenails are "exhausting." *Id.*

Petitioner stated that she has suffered ongoing effects from her long-term catheterization. Tr. at 43. She has had kidney stones, urinary tract infection symptoms, and loss of bladder control. *Id.* In March 2022, she underwent a cystoscopy and removal of a large stone from her bladder. *Id.* at 44. She testified that she only began having these issues after being catheterized due to her GBS. *Id.*

Petitioner testified that, according to her treating physicians, she is not expected to improve in terms of her functional limitations. Tr. at 45. Currently, she has difficulty shopping due to fatigue and is only able to drive short distances because of pain in her feet and loss of reflexes. *Id.* at 46. She stated that her husband now handles the majority of meal preparation and all of her transportation. *Id.* She is able to manage small tasks such as making the bed and setting the table. *Id.* She is unable to clean her house aside from light dusting. *Id.* at 46-47. She cannot work in her garden due to balance issues and foot pain. *Id.* at 47.

Petitioner testified that travel has become more difficult for her. Tr. at 47. She requires wheelchair assistance in airports and finds travel more fatiguing than she did previously. *Id.*

Petitioner explained that, since developing GBS, she must "budget" her energy because she does not have enough stamina to do everything she used to do. Tr. at 48. For example, if she does the laundry one day, she cannot help with meal prep because she does not have sufficient energy. *Id.*

Petitioner described her current pain levels as consistent cramping in her feet, lower legs, thighs, arms, and hands. Tr. at 48. She testified that, when her pain and lack of energy are at their worst, she finds it difficult to communicate and prefers to "cocoon" herself until it improves. *Id.* She deals with her pain in part by removing stimuli such as her watch and her clothing and resting her hands on soft surfaces. *Id.* at 49. She stated that overexertion causes her pain to worsen. *Id.* She stated that "[she is] managing, but this is never going to get better." *Id.* at 50. She described her pain as "constant." *Id.*

Petitioner listed her current medications as gabapentin, over the counter pain medication, chlorthalidone, oxybutynin, vitamin supplements, Cosequin, zinc, and niacin. Tr. at 50. Petitioner testified that in-home aide services would assist her first with everyday tasks such as shopping, meal preparation, and housekeeping, as well as transportation to medical appointments. *Id.* at 50-51. Second, she would be safer in her home because there would be someone there to assist her if she fell. *Id.* at 51.

Petitioner stated that "[i]solation is a tremendous factor in GBS recovery." Tr. at 51. She would like to rejoin the organizations in which she was a member prior to her GBS, but she is uncertain that she could meet the demands of these activities." *Id.* She stated that in-home care would free her and her husband to begin doing some of these things again. *Id.* at 51-52.

Petitioner explained her request for compensation for assistance with heavy housekeeping, which she can no longer do. Tr. at 52. This would include cleaning window blinds and heavy drapes, cleaning windows, and replacing storm windows. *Id.* With regard to her requested compensation for handyman services, Petitioner testified that this would include hanging pictures and wall decor, hanging drapery rods, wallpapering, changing lightbulbs, transporting large or bulky items from her car to her house, and touching up wall paint. *Id.* at 53. Petitioner explained that compensation for gardening services would be used for planting, care, and removal of annuals and weeding the garden. *Id.* at 54. She stated that she does not feel comfortable walking on the gravel paths in her garden due to her issues with pain and balance. *Id.* Petitioner further stated that she needs assistance with mending and alterations because she previously made, repaired, and altered her own clothing. *Id.* She is no longer able to thread her sewing machine or use a needle and thread because of her problems with her hands. *Id.*

On cross examination, Petitioner stated that prior to her vaccination, she had issues with her back, including a herniated disk. Tr. at 57. She had also suffered a vagus nerve injury 15 years before the onset of her GBS that caused vocal cord dysfunction and colic pain. *Id.*

Petitioner explained that she lives in a ranch-style home in which the bedrooms, bathrooms, and laundry room are on the main floor. Tr. at 57. The house also has a basement and an upper loft. *Id.*

Petitioner stated that from approximately July 2018 to January 2021, she did not actively seek medical treatment for her GBS. Tr. at 58. She had been told that the damage to her nerves was permanent and would not improve. *Id.* She last saw a neurologist in April 2018, a urologist and nephrologist in the summer of 2023, and her primary care physician in April 2023. *Id.* at 58-60. She has seen a podiatrist about calluses forming on her feet due to changes in her gait. *Id.* at

60. She has not sought mental health services or counselling related to her GBS. *Id.* She last underwent PT and OT in November 2019. *Id.* at 61.

Petitioner testified that she is currently able to walk about a mile daily. Tr. at 61. She is able to drive and has not needed adaptations for her vehicle. *Id.* at 61-62. She is also able to dress herself. *Id.* at 62. Since her GBS diagnosis, Petitioner and her husband have taken two cruises, to Alaska and to New England. *Id.* They have also travelled to South Carolina and to California by plane. *Id.* at 63.

Since November 2017, Petitioner has employed a cleaning service to clean her home every three weeks. Tr. at 63. She does not currently employ anyone for home maintenance or lawn care. *Id.* at 63-64.

**B.  Elizabeth Kattman, BS, MS**

1.  Qualifications

Ms. Kattman is a certified rehabilitation counselor and certified life care planner with ReEntry Rehabilitations Services, Inc. Ex. 15 ("Kattman CV") at 1. She received a master's degree in special education with emphasis in rehabilitation counseling at Utah State University in 1999 and bachelor's degrees in human rehabilitation services and gerontology from the University of Northern Colorado in 1993. *Id.* I recognized her as an expert in life care planning. Tr. at 67.

2.  Testimony

Ms. Kattman visited Petitioner at her home in May 2021 and May 2022. Tr. at 66. She also conducted interviews with Petitioner's primary care provider and her urologist, as well as Petitioner's daughter. *Id.* at 66-67.

Ms. Kattman recommends that Petitioner receive unskilled in-home assistance through a home health agency. Tr. at 67-68. She testified that Petitioner suffers residual weakness, sensory issues, and pain in her extremities that make heavy activity difficult. *Id.* at 68. She also has issues with balance that necessitate the use of a cane outdoors, fatigue, and urinary incontinence. *Id.* Ms. Kattman recommends four hours per day now through the age of 79, followed by six hours per day beginning at age 80. *Id.* at 68-69. She opined that Petitioner has to ration her time and energy due to the exacerbation of her pain and sensory issues. *Id.* at 69.

Ms. Kattman testified that one of her goals in life care planning is to enable Petitioner to return to some of the activities she enjoyed prior to her GBS to improve her quality of life. *Id.* at 70. She opined that assistance with household tasks would give Petitioner the opportunity to use her limited energy for activities she enjoys, such as volunteering and working on crafting projects. *Id.*

Ms. Kattman testified that Petitioner currently relies on her husband for almost all household tasks and transportation. Tr. at 70-71. She recommended compensation for heavy housekeeping twice monthly to account for necessary cleaning of windows, drapes, blinds,

chandeliers, and wall hangings. *Id.* at 71-72. She recommended compensation for handyman services for the specific tasks that Petitioner performed prior to her GBS: cleaning high places on a stepstool, putting up decorations, changing lightbulbs, touching up wall paint, and hanging wallpaper. *Id.* at 72. She recommended compensation for gardening services to assist Petitioner with caring for her vegetable garden and roses. *Id.* at 73. She recommended compensation for mending and alterations to account for these activities that Petitioner did prior to her GBS and is no longer able to perform. *Id.* at 73-74.

Upon questioning by the Court, Ms. Kattman testified that her recommendations as to the number of hours of in-home care for Petitioner are based on data from the American Time Use Survey regarding daily activities. Tr. at 78-79. She also considered Petitioner's specific daily activities, including gardening and sewing. *Id.* at 79. Ms. Kattman opined that Petitioner was active for ten to 12 hours per day prior to her GBS and is now active for two to three hours per day, and therefor "a few hours a day of care" is appropriate. *Id.* She added that she recommended increasing the number of daily hours from four to six when Petitioner turns 80 at the recommendation of Petitioner's primary care physician, Dr. Archabal Lee. *Id.* at 80.

### C. Linda Curtis, RN, MS, CNLP, CCM

#### 1. Qualifications

Ms. Curtis is the president and consulting expert at Medical Record Review, LLC. Ex. D ("Curtis CV") at 1. She earned her master's degree in health services management at Florida Institute of Technology in 1991 and her bachelor's degree in nursing at Florida State University in 1982. *Id.* She is a registered nurse, a certified nurse life care planner, and a certified case manager. *Id.* at 2. I recognized her as an expert nurse life care planner. Tr. at 84.

#### 2. Testimony

Ms. Curtis testified that she also attended the visits to Petitioner's home in May of 2021 and May of 2022. Tr. at 84-85. She testified that during the home visit in May 2021, Petitioner was taking frequent walks with a cane, either outside or on a treadmill in her home. *Id.* at 86. Petitioner was able to drive short distances and perform errands. *Id.* At that time, Petitioner was involved in a professional gambling venture with her husband. *Id.* at 87.

Ms. Curtis testified that at the time of her May 2022 visit, Petitioner was able to do laundry and cook without the help of assistive devices and she was able to move around her home. Tr. at 87. Petitioner was able to walk about a mile and was participating in a program at a local health club. *Id.* at 88.

Ms. Curtis testified that her life care plan includes coverage under Medicare Advantage, which enables Petitioner to see her primary care physician and her specialists at no out-of-pocket cost. Tr. at 88. Her plan also provides for laboratory testing and supplies to address Petitioner's urinary issues, prescription and over the counter medications, PT, OT, and a case manager to help Petitioner develop more independence. *Id.* at 89.

With regard to the disputed items, Ms. Curtis opined that Petitioner certainly has GBS and its sequelae, but that she is "very independent with her activities of daily living." Tr. at 90. Ms. Curtis testified that this was "fairly significant for [her]" in the development of her life care plan. *Id.* She opined that Petitioner does not require a home health aide, but rather several hours of weekly assistance with the tasks she is unable to perform due to her lack of stamina. *Id.* at 90-91. She opined that the six hours per week until age 80 and 14 hours per week after that can be flexible because Petitioner can choose how to supplement her own abilities. *Id.* Ms. Curtis testified that compensation in the Vaccine Program is not intended to improve a petitioner's quality of life, and that such compensation must be reasonable and necessary. *Id.* at 92.

Ms. Curtis testified that she did not include heavy housekeeping, handyman services, gardening services, or mending and alterations in her life care plan because such routine living expenses are not compensable in the Program. Tr. at 92. She opined that life care planning in the Vaccine Program is different from that in the private sector in that it only provides for basic care, not routine expenses. *Id.* at 92-93.[6]

On questioning by the Court, Ms. Curtis agreed that regarding routine expenses, whether a petitioner was performing certain activities prior to vaccine injury and can no longer do so makes a difference. Tr. at 94. She added that home health aides generally perform light housekeeping tasks such as tidying and cleaning up the kitchen. *Id.* She also opined that it is more common to pay for these kinds of services as one ages and as one's abilities change. *Id.* Ms. Curtis testified that she arrived at her recommended number of weekly hours based in part on her opinion that Petitioner does not need assistance with activities of daily living. *Id.* at 95. She opined that a few hours twice per week would be enough for Petitioner to be able to rest and conserve her limited energy. *Id.*

On cross-examination, Ms. Curtis testified that she is still a licensed nurse and that she provides catastrophic case management at Craig Hospital. Tr. at 96. She testified that judging how much of the household work will be taken on by Petitioner's husband is speculative, and that she assumes a 50/50 division of labor. *Id.* She disagreed with Petitioner's contention that she relied on her husband for 99% of her transportation, stating that Petitioner was able to run errands independently, and could also do laundry and prepare meals. *Id.* at 97.

## IV. Parties' Contentions

On August 26, 2020, Respondent conceded that Petitioner is entitled to compensation. ECF No. 16 ("Resp't's Rep.") at 1. The parties advise that they have agreed to awards for lost earnings in the amount of $33,468.00 and out-of-pocket expenses in the amount of $11,233.36. ECF No. 76 at 1. The remaining issues to be resolved are pain and suffering and five life care plan items, namely (1) care assistance, (2) heavy housekeeping, (3) handyman services, (4) gardening assistance, and (5) mending and alterations. *Id.* at 1-2. I discuss the parties' contentions in each category listed above.

---

[6] At this time, Petitioner's counsel objected to Ms. Curtis giving legal opinions. The objection was sustained. Tr. at 93. It is within the purview of the court to decide which services are compensable in the Vaccine Program.

### A.  Pain and Suffering

Petitioner argues for the statutory cap of $250,000 for pain and suffering and if past pain and suffering does not meet to the statutory cap, an award of $24,000 per year for future pain and suffering. Pet'r's Post-Hearing Br. at 34-35, ECF No. 96. To support these numbers, Petitioner argues that "[t]he severity of [Petitioner's] injury is at the most severe end of the spectrum" and "[Petitioner] has been robbed of her life." *Id.* at 33. Petitioner was hospitalized and spent months in a rehabilitation facility and has experienced pain not alleviated by medication. *Id.* Ms. Hoisington continues to experience pain and cramping. Tr. at 48. Further, her GBS caused her to break her ankle, which required surgery to repair, along with additional pain and extensive physical therapy. *Id.* at 34-40. She must plan her day to account for her energy levels. Pet'r's Post-Hearing Br. at 33. Ms. Hoisington will continue to suffer from pain, cramping, fatigue, and weakness for the rest of her life. *Id.* at 34. Petitioner argues that the $250,000 statutory cap "does not even begin to cover the complete disintegration of her life and the daily pain." *Id.*

Respondent argues for $185,000 for pain and suffering and no future pain and suffering award. Resp't's Post-Hearing Br. at 2. Respondent states that "Petitioner's GBS medical course and treatment was moderate, and included hospital care, initiation of IVIF, oral medications, inpatient rehabilitation, and outpatient medical evaluations and therapies." Resp't's Post-Hearing Br. at 17-18. In both site visits, Petitioner was independent in her mobility and in her ADLs. *Id.* at 18. Furthermore, Petitioner has not seen a neurologist since April 2018. *Id.*

### B.  Life Care Plan Items

#### 1.  Care Assistance

Petitioner requests care assistance for four hours per day until age 79 and then six hours per day from age 80 to life. Ms. Hoisington is unable to perform many daily activities that she could do prior to her GBS, which include bathing/showering, doing the laundry, and general household activities. Tr. at 30-32. Ms. Kattman testified that she arrived at these hours based on her analysis of what Ms. Hoisington said she can do; she has limited energy every day so she must pick and choose what tasks she performs. *Id.* at 69. As such, Ms. Kattman listed a number of activities she believed a home health aide would be helpful for currently: observation during showering and bathing, meal preparation, and help returning Ms. Hoisington to activities she used enjoy, such as her involvement with nonprofit organizations. *Id.* at 69-70.

Respondent requests care assistance for six hours per week until age 79 and then 14 hours per week from age 80 to life. Respondent cites to the site visit with Petitioner in 2022, where Ms. Curtis noted that Ms. Hoisington was largely independent; she could cook, walk one mile, and participate in an exercise program offered by Medicare. Resp't's Post-Hearing Br. at 3-4. Ms. Curtis recognized that Ms. Hoisington would fatigue after doing chores like laundry and other physical activities. Tr. at 87. Ms. Curtis also noted that equipment like a shower chair and grab bars would mitigate the need for observation while showering and bathing. *Id.* at 90. Ms. Curtis' life care plan includes an increase of care at age 80 as Petitioner's PCP suggested. *Id.* at 91.

2. <u>Heavy Housekeeping</u>

Petitioner requests $3,600 per year for heavy housekeeping. Petitioner states that she was previously able to perform tasks such as cleaning her windows, curtains, and blinds. Petitioner cites to *Spayde*, which awarded costs for home maintenance. *See Spayde v. Sec'y of Health and Hum. Servs.*, No. 16-1499V, 2023 WL 6806125, at *7 (Fed. Cl. Spec. Mstr. Sep. 21, 2023).

Respondent argues that this is not a reasonable cost in accordance with the Vaccine Act. Resp't's Post-Hearing Br. at 5. The Vaccine Act includes the following as part of future unreimbursable expense: "rehabilitation, developmental evaluation, special education, vocational training and placement, case management services, counseling, emotional or behavioral therapy, residential and custodial care and service expenses, special equipment, related travel expenses, and facilities." *See* 42 U.S.C. § 300aa-15(a)(1)(A)(iii). As such, Respondent believes this cost should be denied.

3. <u>Handyman Services</u>

Petitioner requests $700 per year for handyman services. Petitioner claims she can no longer perform light maintenance tasks around the house such as changing lightbulbs, doing paint touchups, and hanging up art. Pet'r's Post-Hearing Br. at 37-38. Petitioner cites to *Schettl* for support. *See generally Schettl v. Sec'y of Health and Hum. Servs.*, No. 14-422V, 2021 WL 6502203, at *2 (Fed. Cl. Spec. Mstr. Dec. 20, 2021) (awarding reasonable costs such as heavy housekeeping and handman services).

Respondent argues this is a routine expense and does not result from Petitioner's injury. Resp't's Post-Hearing Br. at 6-7. To further support his argument, Respondent cites to *Parr* where the court states, "Medical items requested in life care plans are to be based on medically substantiated needs, not on some abstract wish list or on speculation by the life care planner." *Parr v. Sec'y of Health and Hum. Servs.*, No. 90-1324V, 1993 WL 151860, slip op., at *3 (Fed. Cl. Spec. Mstr. April 26, 1993); *see also Kono v. Sec'y of Health and Hum. Servs.*, No. 93-123V, 1995 WL 774598, slip op. at *7-8 (Fed. Cl. Spec. Mstr. Dec. 21, 1995) (rejecting recommendations by life care planner that were based upon planner's general experience and unsupported speculation regarding child's future care needs).

4. <u>Gardening Assistance</u>

Petitioner requests $1,584 per year for gardening assistance. Petitioner testified that she was an avid gardener and planted plants throughout the year that required maintenance and removal. Petitioner also used to maintain a small vegetable garden. Petitioner cites to *Simmons* as support for her position from another case in the Vaccine Program. Pet'r's Post-Hearing Br. at 39; *see also Simmons v. Sec'y of Health and Hum. Servs.*, No. 11-216V, 2019 WL 2572256, at *13 (Fed. Cl. Spec. Mstr. May 28, 2019) (awarding compensation for snow removal, lawn care, and handyman services).

Respondent believes that gardening expenses are routine expenses and that they do not result from Petitioner's injury. Resp't's Post-Hearing Br. at 7-8.

5.   Mending and Alterations

Petitioner requests $250 per year for clothing mending and alterations. She had previously been able to fix zippers, replace buttons, and mend tears in fabric. Pet'r's Post-Hearing Br. at 39.

Respondent contends that gardening expenses are routine expenses and that they do not result from Petitioner's injury. Resp't's Post-Hearing Br. at 8-9.

## V.   Legal Framework

Petitioner "bear[s] the burden of proof with respect to each element of compensation requested." *Brewer v. Sec'y of Health & Hum. Servs.*, No. 93-0092V, 1996 WL 147722, at *22 (Fed. Cl. Spec. Mstr. Mar. 18, 1996); *see also* § 11(e) ("[P]etitioner shall submit . . . assessments, evaluations, and prognoses and such other records and documents as are reasonably necessary for the determination of the amount of compensation to be paid to, or on behalf of, the person who suffered such injury . . . .").

### A.   Pain and Suffering

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." § 15(a)(4).

There is no formula for assigning a monetary value to a person's pain and suffering and emotional distress. *I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("Awards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula."); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("[T]he assessment of pain and suffering is inherently a subjective evaluation."). Factors to be considered when determining an award for pain and suffering include: (i) awareness of the injury; (ii) severity of the injury; and (iii) duration of the suffering. *I.D.*, 2013 WL 2448125, at *9 (quoting *McAllister v. Sec'y of Health & Hum. Servs.*, No. 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated & remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

The court can look to prior pain and suffering awards to aid in the resolution of the appropriate amount of compensation for pain and suffering in this case. *See, e.g., Doe 34 v. Sec'y of Health & Hum. Servs.*, 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case"). The undersigned may also rely on her experience adjudicating similar claims. *Hodges v. Sec'y of Health & Hum. Servs.*, 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims). Importantly, however, it must also be stressed that pain and suffering is not determined based on a continuum. *See Graves v. Sec'y of Health & Hum. Servs.*, 109 Fed. Cl. 579 (2013).

In *Graves*, Judge Merow rejected the special master's approach of awarding compensation for pain and suffering based on a spectrum from $0.00 to the statutory $250,000.00 cap. *Graves*, 109 Fed. Cl. at 589-90. Judge Merow noted that this constituted "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly." *Id.* Instead, Judge Merow assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program. *Id.* at 595.

## B. Life Care Items

The Vaccine Program may also award actual unreimbursed expenses which are "reasonabl[y] projected" to be incurred in the future. 42 U.S.C. § 300-aa(15)(a)(1)(A)(iii)(II). Future unreimbursed expenses should be awarded to a degree "beyond that which is required to meet the basic needs of the injured person...but short of that which may be required to optimize the injured person's quality of life. What is reasonably necessary lies somewhere between that which is 'indispensable' and that which is 'advantageous.' " *Scheinfeld v. Sec'y of Health & Hum. Servs.*, No. 90-212V, 1991 WL 94360, at *2 (Fed. Cl. Spec. Mstr. May 20, 1991), cited in *Curri v. Sec'y of Health & Hum. Servs.*, 2018 WL 6273562, at *4 (Fed. Cl. Spec. Mstr. Oc. 31, 2018).

Compensation awarded pursuant to the Vaccine Act shall also include "[a]ctual unreimbursable expenses incurred from the date of the judgment awarding such expenses and reasonable projected unreimbursable expenses" that

(i)     result from the vaccine-related injury for which the [P]etitioner seeks compensation,

(ii)    have been or will be incurred by or on behalf of the person who suffered such injury, and

(iii)   (I) have been or will be for diagnosis and medical or other remedial care determined to be reasonably necessary, or
(II) have been or will be for rehabilitation, developmental evaluation, special education, vocational training and placement, case management services, counseling, emotional or behavioral therapy, residential and custodial care and service expenses, special equipment, related travel expenses, and facilities determined to be reasonably necessary.

§ 15(a)(1)(A).

"[R]easonable projected unreimbursable expenses" must be shown to be "reasonably necessary." § 15(a)(1)(A)(iii). "Special masters have characterized this phrase as a 'vague instruction' and a standard for which there is 'no precise' definition." *Lerwick ex rel. B.L. v. Sec'y of Health & Hum. Servs.*, No. 06-847V, 2014 WL 3720309, at *5 (Fed. Cl. Spec. Mstr. June 30, 2014); *see also I.D.*, 2013 WL 2448125, at *6 (defining "reasonably necessary" to mean "that which is required to meet the basic needs of the injured person . . . but short of that which may be required to optimize the injured person's quality of life" (quoting *Scheinfield v. Sec'y of Health & Hum. Servs.*, No. 90-212V, 1991 WL 94360, at *2 (Cl. Ct. Spec. Mstr. May 20, 1991))); *Bedell v. Sec'y of Health & Hum. Servs.*, No. 90-765V, 1992 WL 266285 (Cl. Ct. Spec. Mstr. Sept. 18,

1992) (defining "reasonably necessary" to mean "more than merely barely adequate, but less than the most optimal imaginable"); *Alonzo v. Sec'y of Health & Hum. Servs.*, No. 18-1157V, 2023 WL 5846682, at *11 (Fed Cl. Spec. Mstr. Aug. 14, 2023).

## VI.   Discussion and Analysis

I will begin by analyzing the parties' arguments relating to an award of pain and suffering. There is no formula for assigning a monetary value to a person's pain and suffering and emotional distress. *See, e.g., I.D. v. Sec'y of Health & Hum. Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013), originally issued Apr. 19, 2013 ("Awards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula."); *Stansfield v. Sec'y of Health & Hum. Servs.*, No. 93-172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("The assessment of pain and suffering is inherently a subjective evaluation."). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering. *See, e.g., I.D.*, 2013 WL 2448125, at *9; *McAllister v. Sec'y of Health & Hum. Servs.*, No 91-103V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), vacated and remanded on other grounds, 70 F.3d 1240 (Fed. Cir. 1995).

Compensation awarded pursuant to the Vaccine Act shall include "actual and projected pain and suffering and emotional distress from the vaccine-related injury . . . not to exceed $250,000." § 15(a)(4). In determining an award for pain and suffering and emotional distress, it is appropriate to consider the severity of injury and awareness and duration of suffering. *See I.D.*, 2013 WL 2448125, at *9-11, *citing McAllister*, 1993 WL 777030, at *3. In evaluating these factors, I have reviewed the entire record, including medical records, documentary evidence, and the affidavit submitted by Petitioner.

In calculating an appropriate award for Petitioner in this case, I do not rely on any single prior decision or case. Rather, I have considered the facts and circumstances presented here, the facts and circumstances in prior relevant cases, and my knowledge and experience adjudicating similar cases.

### A.   Pain and Suffering

1.   <u>Awareness of Suffering</u>

In my experience, awareness of suffering is not typically a disputed issue in cases involving adults and GBS. In this case, neither party has raised, nor am I aware of, any issue concerning Petitioner's awareness of suffering and I find that this matter is not in dispute. Thus, based on the circumstances of this case, I determine that Petitioner had full awareness of her suffering.

2.   <u>Severity of the Injury</u>

Prior to her GBS, Petitioner was generally in good health and lived a reasonably active lifestyle in retirement. Within a few days of receiving the flu vaccine, she began to experience pain and weakness which worsened to the point that she required hospitalization. Ex. 1 at 55-59; Ex. 4 at 78, 86. She spent eight days in the hospital during which she exhibited severe weakness and

numerous sensory issues. *Id.* She received IVIG and was discharged to a skilled nursing facility where she required maximum assistance with mobility and had a great deal of difficulty walking. *Id.* 177, 146. After three days, she had to be hospitalized a second time due to urinary issues and progressive weakness. Ex. 4 at 18-19. Petitioner then spent another seven weeks at the skilled nursing facility, where she made considerable progress toward recovery. Ex. 1 at 194-96. Petitioner fell at her home due to lower extremity weakness and spent another three weeks in a rehabilitation facility having sustained a fractured ankle. Ex. 1 at 201-03. She had surgery to repair the fracture. Petitioner underwent PT and OT beginning her first stay in the skilled nursing facility and continued with these therapies until November 2019. Tr. at 22, 61. Since mid-2018, Petitioner's pain management regimen has included 2700 milligrams of gabapentin daily, as well as 1650 to 3000 milligrams of Tylenol. Tr. at 41. She suffered from urinary incontinence and is currently prescribed oxybutynin to help with urinary leakage. Tr. at 50.

### 3.   Duration of Suffering

The sequelae of Petitioner's GBS continue to present day, but she did not seek medical treatment for her GBS between July 2018 and January 2021. Tr. at 58. She continues to experience pain, weakness, cramping in her feet and legs, lack of stamina, and urinary issues. *Id.* at 61-63. She is able to walk up to a mile and drive short distances. Her ongoing symptoms have impeded her engagement in the activities she once enjoyed, such as gardening, sewing, and volunteer work. Petitioner testified that she has been told that her symptoms are never going to get better.

### 4.   Comparison to Other GBS Awards

In determining an appropriate award for Petitioner's pain and suffering, I have considered other factually similar cases. One such case is *Wilson v. Secretary of Health and Human Services*, in which the special master awarded Mr. Wilson $175,000.00 in actual pain and suffering damages after he developed GBS following flu vaccination. No. 20-588V, 2021 WL 5143925 (Fed. Cl. Spec. Mstr. Oct. 5, 2021).

Like Petitioner, Mr. Wilson's GBS course demanded lengthy hospital and rehab admissions. Mr. Wilson spent a total of 50 days in these facilities due to his injury, while Petitioner spent a total of 66 days, plus an additional 20 days when she fractured her ankle in a fall in January 2018. Mr. Wilson's disease course required more aggressive treatment than Petitioner's, including intubation, life-saving CPR, and a feeding tube. Two weeks of his fifty days' admission were spent in the ICU. However, both individuals required catheterization, significant amounts of PT and OT, and pain medication. Like Petitioner, Mr. Wilson was retired when he received the flu vaccine, and so his injury did not prevent him from working. GBS prevented both Petitioner and Mr. Wilson from pursuing leisure activities that they had formerly enjoyed, but as the special master noted in *Wilson*, there is "a qualitative distinction between someone who is retired and experiences GBS versus someone who is employed and experiences those same challenges to the extent that their employment is negatively impacted." *Wilson*, 2021 WL 5143925, at *5. Mr. Wilson, like Petitioner, also relied on a wheelchair for several months after his discharge home, but his residual symptoms of GBS resolved more quickly. Petitioner required surgery for her ankle, which was a direct result of her GBS; Mr. Wilson did not. Based on the above, I conclude that Petitioner is entitled to a slightly higher pain and suffering award than Mr. Wilson.

I also considered *McCray v. Secretary of Health and Human Services*, in which the special master awarded Petitioner $180,000.00 in actual pain and suffering damages for her GBS following flu vaccination. No. 19-277V, 2021 WL 4618549 (Fed. Cl. Spec. Mstr. Aug. 31, 2021). Like Petitioner, Ms. McCray's GBS course was not severe enough to require aggressive treatment, but she continued to suffer long term residual effects and ongoing functional deficiencies long after her discharge from the hospital. Both individuals made considerable progress toward regaining independence and mobility but continued to struggle with the ongoing effects of GBS for years after their diagnoses. Ms. McCray lost the ability to participate in leisure activities that she had once enjoyed, as did Petitioner, but Ms. McCray was also forced to give up a part time job. Ms. McCray testified, as Petitioner did, that her doctor has told her that her condition will never return to what it was prior to her GBS but did not provide medical evidence or opinion to support this contention. Ms. McCray did not have a GBS-associated surgery.

I also considered the case of *Vallee v. Secretary of Health and Human Services*. No. 20-1381V, 2023 WL 5559174 (Fed. Cl. Spec. Mstr. July 27, 2023). Mr. Vallee, like Petitioner, developed GBS after flu vaccination that required "a moderate, if prolonged, course of treatment." *Id.* at *4. His hospital stay was only five days long, but he underwent a total of 68 physical and occupational therapy sessions. *Id.* Mr. Vallee showed gradual improvement over a period of years, but "required supportive devices to ambulate and reported weakness, fatigue, and numbness until his death" roughly three years after he developed GBS. *Id.* Mr. Vallee died of acute coronary syndrome and GBS was determined to be a contributor, but not a cause, of his death. *Id.* at *2. Like Petitioner, Mr. Vallee was retired at the time of his GBS onset. *Id.* at 4. However, as the special master noted, Mr. Vallee also suffered from "significant comorbidities" that made it more difficult to show the specific impacts that his GBS had had on his life. *Id.* at *5. He also suffered from GBS sequelae for three years, whereas Petitioner has suffered for much longer. Accordingly, Petitioner's pain and suffering award should be higher than Mr. Vallee's $160,000.

For all of the reasons discussed above and based on consideration of the record as a whole, I find that $200,000.00 represents a fair and appropriate amount of compensation for Petitioner's past pain and suffering; I additionally find it is appropriate to award $5,000.00 per year in future pain and suffering until the statutory cap is reached. Petitioner's prolonged hospitalization, her many PT and OT sessions, her urinary incontinence, her inability to engage in former activities and hobbies, her continued pain necessitating pain medication, and her ankle surgery, a direct result of her GBS, all support this award. Additionally, Petitioner's medical condition has not changed for several years, and it is reasonable to conclude that her condition will not improve. Accordingly, and for the reasons discussed above, I award Petitioner $200,000.00 for her past pain and suffering and $5,000.00 per year until the statutory cap is reached for her future pain and suffering.

## B. Life Care Items

### 1. Care Assistance

Both sides agree that Petitioner needs some level of in home assistance. Petitioner requests 28 hours per week now through age 79, and then 42 hours per week from age 80 to life. Respondent

recommends six hours per week now through age 79, and 14 hours per week from age 80 through life.

Petitioner requests in home assistance in order to help her with shopping, meal preparation, housekeeping, errands, and laundry. Tr. at 50. She notes that help with these tasks, which she was able to perform before she developed GBS, would also enable her to have energy to do other activities. Petitioner testified that she has to budget her energy. Tr. at 47-48. Ms. Curtis recognized and agreed that Petitioner's energy level was diminished after she developed GBS. Tr. at 90-91.

I agree that Petitioner needs assistance in the home, and find that 14 hours per week now through age 79 is appropriate. This level of care will allow Petitioner to receive assistance with tasks in the house, and will also allow her to attend appointments on certain days, as needed. In arriving at this number, I have considered Petitioner's needs and limitations, as discussed in her testimony. I have further considered Ms. Curtis' testimony that Petitioner is independent with her ADLs; she is able to walk for one mile; and that Petitioner is able to drive short distances and perform errands. As Petitioner ages, she shall receive compensation for 28 hours per week from age 80 through life. This increase in the hours of care reflects the opinions of both life care planners and Petitioner's PCP, that she will need increased help as she ages.

## 2. Heavy Housekeeping

Petitioner requests $3,600 per year for heavy housekeeping (twice per month; $150 per visit). Respondent recommends this expense be denied. This work includes cleaning skylights, taking the blinds down, bringing them outside and cleaning them, removing drapery and taking it to the cleaners, scrubbing the grout on tiled surfaces, cleaning windows and chandeliers, and replacing storm windows. Tr. at 52. Petitioner testified that she can no longer do this work due to her vaccine injury. Ms. Kattman supports this request. Tr. at 71.

All of the work listed above, except perhaps cleaning grout, does not need to be performed every two weeks; for example, storm windows are changed approximately every six months, and chandeliers may be cleaned every 6-12 months. Because Petitioner performed this work before and no longer can because of her vaccine injury, I find it is appropriate that she receive some compensation to cover heavy housekeeping. I conclude that Petitioner shall receive compensation to cover heavy housekeeping six times per year. This totals $900/year.

## 3. Handyman Services

Petitioner requests $700 per year for handyman services; this includes tasks such as changing ceiling light bulbs, touching up paint on walls, and hanging artwork and wallpaper. Tr. at 53. Respondent contends this expense should be denied.

Hanging artwork and wallpaper are not jobs that are performed yearly. Artwork is hung when someone moves into a house, but not with any frequency after that. Similarly, wallpaper is not replaced annually. While Petitioner did testify (or at least implied) that she changed light bulbs

and touched up paint[7] in the past, I do not find that a handyman is necessary to complete these tasks. This expense is accordingly denied.

### 4. Gardening Services

Petitioner requests $1,584 per year in gardening services. The tasks the gardener would perform include work that Petitioner did herself before her vaccine injury, including weeding, planting and maintaining annuals, maintaining roses, and planting and maintaining a vegetable garden. Petitioner never paid anyone to perform this work before she developed GBS. Respondent argues the request should be denied.

Petitioner presented evidence that she was an enthusiastic gardener before her vaccine injury. She performed this work herself, and derived enjoyment from it. She can no longer perform the work because of her injury. Accordingly, I find it is appropriate to provide Petitioner with compensation for these services. She is awarded $1,584 per year.

### 5. Mending and Alterations

Petitioner requests $250 per year in mending and alteration services. This work includes fixing zippers, repairing or altering clothing, and sewing buttons back onto clothes. Petitioner testified that she performed all of this work herself, before she developed GBS. Now, she can no longer thread a needle or use her sewing machine due to the residual symptoms she still experiences in her hands. Respondent opposes this request.

The record supports the fact that Petitioner performed this work before her vaccine injury; and further, that she no longer can engage in these activities because of her vaccine injury. Because of this, I will award Petitioner compensation for mending and alteration services in the amount of $250 per year.

## VII.    Conclusion

In light of the above analysis, and in consideration of the record as a whole, I find that Petitioner shall be awarded $200,000.00 in compensation for past pain and suffering and $5,000.00 per year for future pain and suffering. In addition, Petitioner shall receive compensation for the life care plan items that are described in this Ruling.

**By Wednesday, August 21, 2024**, the parties shall file a joint status report (1) providing a complete and final life care plan which takes into consideration the items adjudicated herein, and (2) confirming that all items of damages have now been resolved and that no issues remain outstanding. Once these issues have been resolved, a damages decision will issue.

**IT IS SO ORDERED.**

---

[7] No evidence has been presented regarding the location of the paint touch-up. While Petitioner could not climb a ladder to paint, she could touch up paint in areas that she can reach.

**<u>s/ Katherine E. Oler</u>**
Katherine E. Oler
Special Master